**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| DATTO, INC., and DATTO EUROPE LIMITED,<br><br>          Plaintiffs,<br><br>    v.<br><br>DANIEL MOORE<br><br>          Defendant. | Case No. |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Datto, Inc. ("Datto, Inc.") and Datto Europe Limited ("Datto Europe") (collectively, "Datto" or the "Company"), by and through their undersigned attorneys, for its Complaint against Defendant Daniel Moore ("Defendant" or "Moore"), state as follows:

## NATURE OF ACTION

1.      This action arises from Moore's unlawful misappropriation of Datto's valuable trade secrets and other confidential information to use at a direct competitor, ConnectWise LLC ("ConnectWise"), and to unlawfully gain a competitive advantage in the marketplace.  It also arises from Moore's breach of a non-compete agreement with Datto Europe to refrain from competing with Datto Europe for six months following his departure. Datto seeks injunctive relief and damages.

2.      Subsequent to leaving Datto's employment, Moore unlawfully armed himself with dozens of documents containing highly confidential information about Datto's customer-base, pricing, sales, key customer targets, and more.  These documents were among the most valuable

and confidential information from Datto's sales organization, which would give an unfair competitive advantage to anyone trying to compete against Datto, including Moore's new employer, ConnectWise.

3.     Among other things, Moore and ConnectWise can use Datto's confidential information to strategically target Datto's existing and prospective customers and partners and undercut Datto's pricing without having to invest their own time and money in market research and analysis, customer relationship development, and curation of product offering. Furthermore, Moore's possession of documents and knowledge regarding Datto's global business strategies provides ConnectWise with a roadmap it can leverage to isolate its efforts on specific geographic markets and products that Datto has already vetted as commercially valuable and viable.

4.     Upon commencement of his employment with Datto Europe, Moore executed a Fixed Term Contract of Employment (the "Employment Agreement") which contained post-employment obligations including non-disclosure of the Company's trade secrets and confidential information and the prohibition of him competing against Datto for six months and misusing Datto's confidential information.  By misappropriating and failing to return Datto's confidential and trade secret information and accepting employment with ConnectWise, Moore breached his Employment Agreement

5.     Moore's violation of his contractual obligations and misappropriation of Datto's trade secret information has and will continue to irreparably harm Datto, diminish the value of Datto's confidential information and trade secrets, harm Datto's relationships with its customers, and undermine Datto's competitive edge in the information technology services industry.  Moore's unlawful activities must be enjoined.

6.     After learning that Moore joined ConnectWise in breach of his Employment Agreement, Datto attempted to resolve the matter through a cease and desist letter, but those efforts were unsuccessful.   Since sending the letter, Datto discovered Moore's misappropriation and failure to return Datto's trade secret information, which Datto believes Moore is using and disclosing in his current employment at ConnectWise. Therefore, Datto filed this lawsuit seeking, among other things, preliminary and permanent injunctive relief as well as damages against Moore.

## PARTIES

7.     Datto is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

8.     Datto Europe is a limited company registered in the United Kingdom with its registered office at 5 Fleet Place, London, England. Datto Europe is a wholly owned subsidiary of Datto, Inc.

9.     Moore is a United States citizen and former employee of Datto Europe, who worked for Datto Europe in the United Kingdom from on or about January 2, 2019, through July 31, 2020.

10.     Upon information and belief, Moore returned to the United States on or about August 11, 2020, permanently moved to the state of Florida and is now domiciled in the Tampa, Florida area. Upon information and belief, Moore is now a citizen of the State of Florida.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that the lawsuit involves citizens of different states, and this action seeks to protect by way of injunctive relief contract rights, confidential business information, and trade secret information having a value in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest

and costs, and seeks damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

12.     Injunctive relief and a temporary restraining order are sought pursuant to Rule 65 of the Federal Rules of Civil Procedure, and Local Rules 4.05 and 4.06.

13.     The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises out of Moore's violations of federal law. Specifically, Datto asserts a cause of action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA").

14.      Moreover, this Court has subject matter jurisdiction over the state law causes of action under 28 U.S.C. § 1367.

15.     Personal jurisdiction exists over Moore because, upon information and belief, he resides in Florida and has caused harm and injury to Datto in Florida by breaching his contractual and other common law and statutory obligations to Datto in Florida.

16.     Venue is proper in this District under 28 U.S.C. § 1391(c) because a substantial part of the events giving rise to Datto's claims occurred in this District.

## **RELEVANT FACTS**

### **Datto's Business**

17.     Datto is the leading provider of cloud-based software and technology solutions, delivered through managed service providers ("MSPs") to small and medium businesses ("SMBs").

18.     Datto's software and technology solutions are delivered or sold to SMBs by its worldwide network of MSPs.  Each member of Datto's MSP network is referred to as an "MSP" or "MSP partner."

4

19.     An MSP is an IT professional or company that manages a customer's IT infrastructure by handling functions, such as managing network infrastructure (including email), hosting servers, and protecting data.  Datto offers MSPs a portfolio of technology products, which the MSPs either use to run their businesses ("Sell-to" products) or sell to their small and medium business clients ("Sell-through" products).

20.     Datto's product engineers invest significant time refining Datto's suite of technology products based on hours of surveying and researching the market pressures facing its MSP partners and their small and medium business clients.

### Moore's Position and Job Duties

21.     On December 6, 2018, Moore accepted the position of "Director of Commercial Operations, EMEA" with Datto Europe located in the United Kingdom. His employment commenced on January 2, 2019.

22.     As Datto's Director of Commercial Operations, Moore reported to Nikhil Harsh, Vice President of Revenue Operations, who reported to Sanjay Singh, Chief Revenue Officer. Both Harsh and Singh are based in the United States and are employees of Datto.

23.     In his role, Moore was broadly responsible for helping to drive Datto's revenue by analyzing and compiling data and implementing tools and strategies to grow Datto's global sales, increase market share, to identify the needs of current and prospective MSP partners, and to improve the operational efficiency of Datto's sales efforts.

24.     As a member of the global Revenue Operations team, Moore regularly reviewed and analyzed data summarizing the productivity and effectiveness of Datto's sales team. This information included sales statistics of Datto products, engagement activity with MSP partners, and Datto's presence in markets throughout the world.

5

25.     In addition, Moore implemented key performance indicators and metrics for the sales team, including helping create playbooks to drive the acquisition of new MSPs.

26.     Moore was the primary "deal desk" approver for deals involving the EMEA (*i.e.,* Europe, the Middle East, and Africa) and APAC (*i.e.,* Asia-Pacific) regions and was the secondary approver for U.S. deals. Deal desk approval is needed for all sales that have unusual terms, such as special discounts on particularly important opportunities or for sensitive relationships or products that needed extra support.  When Harsh was out on vacation or leave, Moore was the primary approver globally.

27.     Moore also was responsible for, among other things, identifying scalable upsell opportunities, determining which products Datto should promote in specific markets and to specific MSP partners, forecasting sales goals and benchmarks, and providing tactical strategies to optimize sales and the sales process.  For example, Moore regularly provided strategic input regarding the types of technology products and solutions Datto should push to specific MSP partners based on their past purchase history and customer base.

28.     Another key responsibility of Moore's position was to analyze Datto's sales reports, market research, and other intelligence to help identify markets where Datto could increase its market share by either increasing its sales with current MSP partners or strategically pursuing engagements with new MSPs.  This aspect of Moore's position was critical for determining how Datto would re-invest its money and resources back into the Company.

**Moore's Access to Datto's Confidential Information**

29.     Although Moore was based in the United Kingdom and responsible for Datto's sales operations in EMEA and APAC, as part of his responsibilities for Datto, he also had access

to Datto's most sensitive and confidential information on a global level, including financial data and metrics.

30.     Moore had broad access to, and regularly used Datto's confidential information detailing the company's sales performance in every geographic market and with every one of its MSP partners. This information included Datto's projected profits and revenues, pricing models, and success promoting certain products in key markets.

31.     Moore was an administrator for Datto's global Customer Record Management System (CRM), Sales Force, which Datto has customized to include additional detailed financial data. This system gave Moore global access to Datto's proprietary information contained therein, including financial data and sales history of Datto's MSP partners. For example, Moore regularly accessed Datto's "partner master," an internal proprietary document that contains detailed information about Datto's MSP partners, including the specific products they purchase and the amount of business they conduct with Datto. Datto uses the partner master to assess the specific needs of its MSP partners and identify ways in which Datto can adjust its product offerings and pricing structure to increase revenue.

32.     Moore also had access to "booking reports," which track the revenue generated in each of the geographic markets in which Datto operates.  Moore used booking reports to identify market trends and specific geographic territories where Datto could increase its presence.

33.     Moore had full visibility globally into Datto's cost of goods sold and its sales margins by product and by geographical region. This knowledge enabled him to determine which deals Datto should aggressively pursue.

34.     Additionally, Moore provided input into and received quarterly Board presentations prepared by functional leaders and the executive team for Datto's Board of Directors. These

presentations detail Datto's current market share and sales numbers, as well as business strategy including the markets and products where Datto faces competition from other companies, such as ConnectWise.

35.     It takes significant resources to prepare quarterly Board presentations because they involve compiling intelligence from a number of different sources. Moore's access to these confidential presentations helped him to understand how Datto was performing against competitors in various markets and to determine Datto's global strategy for gaining market share.

36.     In addition to the above documents, Moore also had access to the compensation information for Datto sales employees globally including individual sales quotas, sales closed, commission structures, and metrics used by Datto to determine sales employee compensation. Moore used this information to identify ways that Datto could reduce its costs, set sales benchmarks, and create incentives to increase the productivity of Datto's sales team.

37.     In his role, Moore was personally involved with preparing a number of Datto's "playbooks," which set forth Datto's global strategies for, among other things, maintaining and growing its top MSP partner accounts, as well as increasing its global presence.  Playbooks are prepared by a team of Datto's employees, who survey representatives of Datto's MSP partners and synthesize the information contained in key documents, including the partner master, booking reports, and Board presentations. Datto invests substantial time and resources to prepare playbooks because these documents set forth the roadmap Datto will implement to increase its MSP partner base.  During the course and scope of his work at Datto, Moore was given access to virtually every Datto playbook worldwide.

38.     Moore was also a member of the global Go to Market ("GTM") leadership team, which met weekly to discuss Datto's business strategies, including but not limited to specific

products Datto should promote, how Datto should set pricing and commission rates, and specific markets and customers Datto should pursue.

39.     Moore also attended a Board of Directors meeting in November 2019.  During this meeting, Moore sat alongside Datto's highest-ranking executives to discuss and develop Datto's strategic priorities for 2020 and beyond.  Moore's membership on the global GTM leadership team and participation in the November 2019 Board of Directors meeting gave him unique insight into Datto's immediate future business goals.

40.     As a Director, Moore also participated in Datto's monthly global Director's Forums, which are meetings where executives or leaders in different portions of Datto's business provide confidential business reports and updates.  Only employees who are director level or above participate in these forums.

41.     Given all of the information Moore was exposed to and meetings he regularly attended as part of his job, he has firsthand knowledge of Datto's confidential global business strategies and information, including but not limited to:

- Datto's upcoming global launch plans and roadmaps for new products, services, and markets;

- Datto's sales numbers for each sales employee, in each market and for each product;

- Datto's commission structure and incentive plans;

- Datto's most recent pricing strategies;

- Datto's global GTM 2020 strategy;

- Cost of goods sold and profit margins on each product;

- Datto's global client list – each MSP's contact information, relationship and sales history;

- Strengths and weaknesses of Datto's products from a selling and MSP perspective;

- The various products Datto intends to market to certain MSP partners in the near future; and

- Datto's business, financial, growth, and investment plans for its global business over the next twelve months.

42.     Moreover, Moore's access to Datto's confidential information, including its financial metrics, intelligence regarding its MSP partners, and global business strategies, give Moore a comprehensive understanding of Datto's strengths, weaknesses, and priorities in markets throughout the world.

43.     The confidential information described above gives Datto a substantial competitive advantage over its existing and would-be competitors, including ConnectWise, due to the significant investment of time, money, and resources that have been poured into developing them. These advantages would be lost if this information became known to the public or to Datto's competitors.  For example, a competitor who knows Datto's product and business plans could attempt to focus its energies in the same space to take away market share.  Furthermore, a competitor with possession of Datto's confidential information, which Moore has knowledge of, would have a highly valuable shortcut for building or competing with Datto for a worldwide network of MSPs, which Datto has expended significant time and resources to develop.

### Moore's Agreements to Protect Datto's Confidential Information and Refrain from Joining a Competitor

44.     Given the competitive value of its confidential information described above, Datto has, at all relevant times, taken reasonable efforts to maintain the secrecy of such information.  For example, upon hire, Datto asks its employees to enter into a confidentiality agreement and other

10

restrictive covenants in order to mitigate against an employee using Datto's confidential information for the benefit of a competitor.

45.     Datto's confidentiality agreement protects the value of Datto's confidential information by asking employees to refrain from disclosing such information both during and after their employment or accessing such information after their last day of employment with Datto. Datto also requires every employee to return all Company property, including all confidential information, in the employee's possession, custody, or control immediately upon termination of employment. Because Datto's confidential information gives Datto a competitive advantage, the confidentiality agreement is necessary to protect Datto's legitimate interest in keeping its confidential information secret.

46.     To help protect Datto's confidential information and prevent it from being shared, either purposefully or by accident, with its competitors, Datto also requires its employees to enter into a non-competition agreement and other restrictive covenants that prohibit employment with competitors, restrict the solicitation of certain existing clients, prospective clients, and employees for a reasonable period of time post-separation.

47.     Additional precautionary measures taken by Datto to safeguard its trade secrets and confidential information include the following: not circulating this information externally or publicly;  controlling electronic access permissions for confidential documents to select employees; restricting access to Datto employees who need information to perform their responsibilities within their unique area of responsibility; and reminding employees via Datto's handbook of their obligations comply with the ongoing promises they made in their respective employment agreements.

48.     In consideration for his employment with Datto, Moore acknowledged, agreed to, and executed the Employment Agreement on December 6, 2018, which contains, among other clauses, a "Confidential Information" provision, and the following restrictive covenants:  "Non-competition," "Non-poaching," "Non-solicitation," "Non-dealing."   A true and correct copy of Moore's Employment Agreement is attached hereto as Exhibit A.

49.     The Confidential Information provision in Moore's Employment Agreement states in pertinent part:

> **15.1 Confidential Information:**  means any information of or regarding the Company or the Company's clients, in any form, which is not known outside of the Company or which the Company compiled or collected at significant expense or effort.  Such information includes, but is not limited to (i) the Company methods of operation and processes and trade secrets; (ii) information regarding the nature and type of services rendered and/or products or processes sold by the Company; (iii) information patent disclosures and patent applications and software; (iv) names of the Company's current, prospective, or former customers; (v) information regarding the Company's relationship to actual or potential customers; (vii) other customer information, sales records, and reports; (viii) the Company personnel data and related information, except for information relating solely to the Company; (ix) information the Company received from third parties in confidence; and (x) business plans, financial data, and projections of the Company.
>
> **15.2  Your obligations.**   You undertake to respect and preserve the confidentiality of the Confidential Information for a period of five years after the date of such disclosure (subject to clause 15.4 below).  You shall not without the prior written consent of the Company:
>
> a) communicate, or otherwise make available, the Confidential Information to any third party; or
>
> b) use the Confidential Information for any commercial, industrial or other purpose whatsoever other than the Objective; or
>
> c) copy, adapt, or otherwise reproduce the Confidential Information save as strictly necessary for the purposes of the Objective.
>
> **15.3 Confidential Information** will be and will remain the Company's sole and exclusive property (or the property of the third party who made it available to the Company, as the case may be). Immediately upon the

termination of my employment with the Company or at any time upon the Company's request, I will return all of the Company's property that is in my possession, custody, or control, including but not limited to Confidential Information of the Company. Breach of this confidentiality clause will be treated as gross misconduct and the Company will take appropriate action under the Disciplinary Policy. You should also understand that this duty of confidentiality continues to apply after termination of your employment with the Company.

(*See* Exhibit A ¶¶ 15.1, 15.2, 15.3).

50.     The restrictions contained in the Confidential Information provision cover a five-year period because given the nature of the IT services industry, Datto's confidential information, such as its proprietary analysis of prospective MSPs and geographic markets, remain vital and valuable to its business model for many years after its development.

51.     By agreeing to the Confidential Information provision in the Employment Agreement, Moore acknowledged the utmost importance in maintaining the secrecy of Datto's confidential information, and the substantial investment Datto has made to develop this information.

52.     Moreover, Section 14 of the Employment Agreement contains the restrictive covenants Moore agreed to abide by following the end of his employment with Datto. More specifically, Section 14.1 contains the following provisions:

a.     **Non-competition.**  You shall not at any time prior to the termination of your employment, or for a period of 6 months after the termination of your employment compete with the company either my joining a competitor or b setting up your own business;

b.     **Non-poaching.**  You shall not at any time prior to the termination of your employment or for a period of 6 months after the termination of your employment, either on your own or for any other person directly or indirectly endeavour to entice away from the Company, any person who is an employee of the Company or otherwise encourage any such employee to breach his contract of employment.  Further, with those clients and customers whom you had regular contact with during the 12 months preceding the termination of your employment with a view to the specific

13

knowledge or skills of such person being used by or for the benefit of any person carrying on business in competition with the business carried on by the Company.

     c.    **Non-solicitation.**  You shall not for a period of 6 months after the termination of your employment either on your own behalf or for any other person directly or indirectly approach, canvass, solicit or otherwise endeavour to entice away from the Company the custom of any person or company who at any time during the 12 months preceding the termination of employment both has been a customer, client or supplier for the Company and with whom you shall have personally had dealings;

     d.    **Non-dealing.**  You shall not for a period of 6 months after the termination of your employment either on your own behalf or for any other person supply, directly or indirectly and whether solicited by you or not, any goods or services to any person or company who at any time during the 12 months preceding the termination of your employment both has been a customer, client or supplier of the Company and with whom you shall have personally had dealings.

(*See* Exhibit A ¶ 14.1(a), (b), (c) and (d)).

53.    Although the Employment Agreement states it shall be interpreted and construed in accordance with English law, the Employment Agreement identifies that either party may enforce the provisions contained therein "in the courts of any jurisdiction having competence to issue an injunction directly enforceable against such party." (*See* Exhibit A ¶ 15.7)

54.    On July 24, 2020, Moore also entered into the Settlement Agreement, in which he acknowledged that Sections 14 and 15 of his Employment Agreement survived and remained enforceable.

### Moore's Misappropriation of Datto's Confidential and Proprietary Information

55.    At the outset of his employment, Moore was issued a laptop by Datto (with Serial No. PF16MG9P, and hereinafter referred to as "Laptop 1") for performing his job duties.

56.    On January 2, 2020, Datto issued Moore a second laptop (with Serial No. PF1DZ5KZ, and hereinafter referred to as "Laptop 2") in response to his complaints that Laptop

1 was not working properly. Although Moore was supposed to return Laptop 1 upon receipt of Laptop 2, he failed to do so and, instead, retained possession of both laptops.

57.     On May 11, 2020, Singh called Moore to inform him that, consistent with English law concerning reductions in force impacting more than 20 employees, Moore's role was at risk of being made redundant. On May 12, 2020, Datto sent Moore a Notice of Provisional Selection for Redundancy.  From that date through his official termination date, Moore was not asked nor expected to perform any work for Datto and therefore Moore would have no business reason to access any of Datto's confidential or proprietary information.

58.     On July 17, 2020, Datto notified Moore that his employment was terminated, however, Moore ultimately negotiated to make his official last day of employment July 31, 2020.

59.     At that time, Moore was still in possession of both Laptop 1 and Laptop 2.  Datto's operations team made arrangements to retrieve both of these laptops from Moore. Datto mailed Moore a prepaid shipping box on August 3, 2020, which he received on or about August 5, 2020.

60.     On August 11, 2020, Datto's office located in Reading, England received a shipment from Moore containing both laptops.

61.     Forensic analysis shows that between May 11, 2020, when he was informed of his redundancy, and August 3, 2020, after the end of his employment, Moore inserted at least four different USB storage devices into his Datto laptops, which contain hundreds of confidential Datto documents. Moore inserted each of these USB storage devices, and accessed the laptops, during times when he had no business reason to access his Datto laptops. Moore never returned any of these USB devices to Datto and, upon information and belief, Moore is currently in possession of these devices that contain hundreds of confidential Datto documents.

62.     Furthermore, the forensic examination of Moore's Datto-issued laptops revealed that on August 3, 2020—which was after his employment ended and immediately before he returned the laptops—Moore accessed hundreds of confidential files on the laptops after inserting an USB device into his Datto-issued laptops for the purpose of misappropriating Datto's confidential trade secrets information. Moore had no authority or legitimate business reason for accessing any of these documents. The documents Moore accessed and misappropriated contain, among other things, information about current and target customers, spend by customer and product, sales forecasts, and geographic regions ranked by sales opportunities. Moore never returned these documents to Datto and, upon information and belief, they are still in his possession.

63.     The documents Moore misappropriated and failed to return also contain, among other things, confidential information regarding Datto's sales operations and prospective opportunities globally, 2020 sales quotas, plans and targets for Datto's sales representatives in EMEA, confidential compensation information for all Datto sales representatives globally, confidential and proprietary information about Datto's MSP partners, including the specific products they purchase, their purchase history and the amount of business they conduct with Datto, and  confidential information Datto has collected regarding the MSPs.

64.     The information in the documents Moore misappropriated and failed to return derive independent economic value from not being regularly known to, and is not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  It gives Datto a substantial competitive advantage over its competitors because it gives Datto a broad insight into the buying behaviors of MSPs.  Datto invests significant time and resources to collect and analyze the data. These advantages evaporate if this information falls into the hands of a competitor.  For example, a competitor with possession

of the documents Moore has taken from Datto could use the proprietary customer list to contact MSPs and use the confidential information about Datto's MSP partners, such as their customer spend and upcoming product orders, to target certain MSP partners, undercut Datto's pricing and poach business away from Datto. Equally as important, a competitor could also use this information to avoid investing time and resources in pursuing less lucrative opportunities with specific MSP partners and in specific geographic markets. Furthermore, a competitor could use confidential information about Datto's sales performance and forecasts to focus on specific geographic markets to gain market share.

65.     Moore is currently in unlawful possession of, and is unlawfully using and disclosing in his current role with ConnectWise in the Tampa, Florida area, Datto's confidential and trade secret information contained in the Datto documents he misappropriated and failed to return upon his departure from Datto.

### Competition Between Datto and ConnectWise

66.     ConnectWise is a direct competitor of Datto. Like Datto, ConnectWise delivers its technology products and solutions through a network of worldwide MSP partners. As a result, ConnectWise and Datto share similar business models that rely on relationships with MSPs to generate revenue and gain recognition in the market.

67.     ConnectWise has publicly acknowledged the competition between Datto and ConnectWise. For example, in January 2018, ConnectWise invited competitors, including Datto, to its IT Nation Conference in Orlando, Florida.  In an article published by CRN, ConnectWise's CEO acknowledged that ConnectWise's invitation to its competitors to attend IT Nation is an

17

extension of the company's commitment to providing an open platform for MSPs.[1] The article described Datto as "ConnectWise's biggest competitor."

68.     The competition between Datto and ConnectWise is particularly fierce because both Datto and ConnectWise offer a similar suite of technology products and solutions.

69.     As a result of these similarities, Datto and ConnectWise engage in head-to-head competition to sell their products and services to MSPs worldwide, including in the United States.

### Moore's Position with ConnectWise

70.     Despite being fully aware of the obligations in his Employment Agreement, including his non-competition obligations, Moore joined ConnectWise. Upon information and belief, Moore received the offer of employment from ConnectWise while still employed by Datto and commenced employment with ConnectWise on or about September 1, 2020.

71.     Upon information and belief, Moore's role as Vice-President of Sales Operations at ConnectWise is similar to, and in direct competition with, the role and responsibilities he was performing for Datto. Upon information and belief, Moore's new duties with ConnectWise involve the same responsibilities he performed for Datto, including driving revenue, formulating strategies for increasing market share in new and existing markets, assessing the needs of current MSP partners, identifying ways to grow the MSP network, and generally improving sales performance and efficiency.

72.     Upon information and belief, although Moore will be based in ConnectWise's office located in Tampa, Florida, from where he will help drive ConnectWise's global sales

---

[1] See "ConnectWise Issues Open Invite To Competitors Datto, Kaseya, SolarWinds To Attend IT Nation Conference," https://www.crn.com/news/channel-programs/300098656/connectwise-issues-open-invite-to-competitors-datto-kaseya-solarwinds-to-attend-it-nation-conference.htm (January 31, 2018).

revenues.  In order to perform his job duties for ConnectWise, Moore will need to identify ways ConnectWise can increase its revenue by, among other things, increasing sales, strengthening its MSP network, and taking market share from its competitors, especially Datto.

73.     As described above, Moore has firsthand knowledge and is in possession of confidential documents that will assist him in this endeavor, including confidential information about Datto's pricing, product offerings, personnel, sales data, and relationships with its MSP partners, even Datto's customer list and contacts. Moore obtained this information through his exposure to, and use of, among other things, the partner master, booking reports, quarterly Board decks and playbooks and his copying of Datto's confidential and proprietary documents from his Datto-issued laptops. This information gives Moore a nuanced understanding of the needs of Datto's MSP partners and critically, vulnerable areas that ConnectWise can exploit.

74.     Armed with this immensely valuable information from Moore, ConnectWise can unfairly compete with Datto without having to invest its own time and money in market research and analysis, MSP relationship development, and curation of product offerings. Among other things, ConnectWise will be able to identify and to strategically target Datto's MSP partners, especially those whose contracts are up for renewal or future negotiations, to gain an unfair advantage over Datto. ConnectWise can also use this information to avoid investing resources into researching, analyzing, and pursuing less financially lucrative opportunities with specific MSPs and in specific geographic markets.

75.     Furthermore, Moore's knowledge and possession of documents containing Datto's global business strategies, including the products, markets, and MSP partners Datto deems particularly valuable, provides ConnectWise with a roadmap for future competition with Datto. As described above, Moore's preparation of playbooks, membership on the global GTM leadership

19

team, and participation in the November 2019 Board of Directors meeting exposed him to, among other things, information about specific products Datto wants to promote, as well as markets and MSPs Datto wants to pursue.

76.     Moore is also in possession of and using Datto's proprietary documents that contain, among other things, Datto's sales forecasts and strategies for increasing its business with MSPs worldwide.

77.     ConnectWise can now leverage Moore's knowledge and the documents in his possession to shape its own global strategy to better compete against Datto and isolate its efforts on specific geographic markets that Datto has already vetted as commercially valuable. Instead of expending its own resources to compile and analyze hundreds of data points on specific geographic markets, ConnectWise can simply leverage Datto's valuable confidential information to target markets with significant upside.

78.     Moore is in possession of, and is using, Datto's confidential information, such as its customer list, sales data, financial metrics and global business strategies, in his new role for ConnectWise.

79.     Datto Europe and Datto maintain joint ownership of the trade secrets and confidential information that Moore was exposed to at Datto and misappropriated upon his departure.

80.     Unless Moore is prohibited from working in his current position at ConnectWise for an appropriate period, but no fewer than six (6) months following the date of an order from this Court, Datto will suffer irreparable harm, including loss of or damage to client relationships, client goodwill, and client revenues.

**Datto's Efforts to Avoid Litigation**

81.     As soon as possible following its discovery of Moore's unlawful conduct described herein, Datto sought to end Moore's unlawful competition against Datto through his new position at ConnectWise in violation of his Employment Agreement.

82.     On September 18, 2020, Datto sent a cease and desist and litigation hold letter to Moore as well as ConnectWise.

83.     In its letter to Moore, Datto demanded, among other things, that Moore stop unlawfully competing with Datto, and immediately cease and desist any and all communications with ConnectWise regarding Datto's confidential and trade secret information.

84.     Moore failed to provide a satisfactory response to Datto. Accordingly, Datto initiated this action to protect its interests and remedy the irreparable harm that Moore has caused to it.

<u>**COUNT I**</u>
**Breach of Contract (Confidential Information Provision of Employment Agreement)**
**(Injunctive Relief and Damages)**

85.     Datto realleges and incorporates by reference Paragraphs 1 through 84 as though fully set forth herein.

86.     The Employment Agreement is a valid and enforceable contract under English law.

87.     Among other obligations under the Employment Agreement, Moore agreed and was obligated to preserve the secrecy of Datto Europe's confidential information and obtain consent before using or copying Datto Europe's confidential information (per Section 15.2 of the Employment Agreement). Moore also agreed that immediately upon the termination of his employment, he would return all of Datto Europe's confidential information in his possession, custody, or control (per Section 15.3 of the Employment Agreement).

88.     The terms of the Employment Agreement are not greater than is required for the protection of Datto Europe's legitimate business interests, including its trade secret, proprietary and confidential information, and the valuable relationships it has with its customers, which were developed at considerable expense, time, and difficulty.

89.     Moore breached the Employment Agreement by surreptitiously misappropriating Datto documents containing Datto's confidential information from his Datto-issued laptops after he was expected to stop performing his job duties due to the upcoming redundancy of his role and several days after the termination of his employment.

90.     Moore further breached his Employment Agreement by failing to return documents to Datto and currently retaining possession of and using these highly sensitive documents and the information contained therein.

91.     Moore knew he had a duty not to retain any of Datto Europe's confidential information, and Datto reminded Moore of his post-employment obligations prior to his last day of employment.

92.     Moore was not acting within the scope of his employment with Datto Europe when he breached the Employment Agreement because his employment with Datto Europe ended on July 31, 2020.

93.     Moore had no legitimate business reason for accessing any of these documents because at the time he did so, he was either expected to stop performing his job duties or no longer an employee of Datto. Indeed, Moore accessed these documents for the sole purpose of misappropriating the confidential information contained therein.

94.     Datto Europe has fully performed its contractual obligations to Moore under the Employment Agreement.

95.     Datto Europe's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

96.     Moore's actions will continue to cause harm to Datto Europe if not restrained.

97.     Datto Europe has demonstrated that Moore, unless restrained, has already and will continue to engage in conduct that breaches the Employment Agreement.

98.     The terms of the Employment Agreement do not pose an undue hardship on Moore.

99.     The Employment Agreement is not injurious to the public.

100.    Should this Court grant injunctive relief to Datto, the burden on Moore would be slight compared to the injury to Datto if it is not granted.  No injury to Moore would result from an order requiring him to comport his actions under the Employment Agreement.

101.    The grant of an injunction will not disserve the public interest.

### COUNT II
### Breach of Contract (Non-competition Provision of Employment Agreement)
### (Injunctive Relief and Damages)

102.    Datto realleges and incorporates by reference Paragraphs 1 through 84 as though fully set forth herein.

103.    The Employment Agreement is a valid and enforceable contract under English law.

104.    Among other obligations under the Employment Agreement, Moore agreed and was obligated, for a period of six (6) months following the separation of his employment to refrain from competing with Datto Europe by joining a competitor or setting up his own business.

105.    The terms of the Employment Agreement are not greater than is required for the protection of Datto Europe's legitimate business interests, including its trade secret, proprietary and confidential information, and the valuable relationships it has with its customers, which were developed at considerable expense, time, and difficulty.

106.    Moore breached the Employment Agreement by leaving Datto Europe to join ConnectWise, a direct competitor of Datto Europe.  ConnectWise directly competes against Datto Europe to sell technology products and solution to the same customer base of MSPs.

107.    Moore knew he had a duty not to compete against Datto Europe and Datto reminded Moore of his post-employment obligations prior to his last day of employment.

108.    Moore was not acting within the scope of his employment with Datto Europe when he breached the Employment Agreement because his employment with Datto ended on July 31, 2020.

109.    Moore's duties and responsibilities at ConnectWise are the same or substantially similar to and in direct competition with his responsibilities at Datto Europe, and they involve the use or disclosure, or the likelihood of the use or disclosure, of Datto Europe's confidential information.

110.    Datto Europe has fully performed its contractual obligations to Moore under the Employment Agreement.

111.    Datto Europe has suffered and will continue to suffer damages as a result of Moore's breach of contract, including without limitation, harm to Datto Europe's relationships with its MSP partners by unfairly competing for the same customer base, and undermining Datto Europe's competitive edge in the IT services industry.

112.    Datto Europe's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

113.    Moore's actions will continue to cause harm to Datto Europe if not restrained.

114.    Datto Europe has demonstrated that Moore, unless restrained, has already and will continue to engage in conduct that breaches the Employment Agreement.

123857297.1

115.    The terms of the Employment Agreement do not pose an undue hardship on Moore.

116.    The Employment Agreement is not injurious to the public.

117.    Should this Court grant injunctive relief to Datto, the burden on Moore would be slight compared to the injury to Datto if it is not granted.  No injury to Moore would result from an order requiring him to comport his actions under the Employment Agreement.

118.    The grant of an injunction will not disserve the public interest.

**COUNT III**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)**
**(Injunctive Relief and Damages)**

119.    Datto realleges and incorporates by reference Paragraphs 1 through 84 as though fully set forth herein.

120.    The Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

121.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

122.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who:  (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

123.    Under    the    DTSA,    "improper    means"    "(A) includes    theft,    bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

124.    Moore    surreptitiously    misappropriated    Datto    documents    containing    Datto's confidential information when he copied those documents from his Datto-issued laptops to several USB devices, which he never returned, after he was expected to stop performing his job duties due to the upcoming redundancy of his role. Additionally, several days after the end of his employment, Moore improperly misappropriated Datto's proprietary documents containing, among other things, Datto's most sensitive and confidential information, including sales metrics and performance worldwide, compensation information for its sales representatives, strategic information regarding

26

Datto's MSP partners, including their customer spend, and proprietary assessment of geographic markets. Moore is unlawfully using and disclosing Datto's trade secret information in his new job at ConnectWise in the Tampa, Florida area.

125.   The information contained in these documents constitute trade secrets related to a product or service used in, or intended for use in, interstate commerce.

126.   This information provides significant value to Datto, and gives Datto a competitive advantage in its industry.

127.   This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  If a competitor, such as ConnectWise, obtained this information, it could target Datto's current and prospective MSP partners and, among other things, unfairly diminish Datto's market share.

128.   Moore knew he had a duty to maintain the secrecy of and return Datto's trade secrets and confidential information, and Datto reminded Moore, by letter, of his obligations prior to his last day of employment. Importantly, Moore also had no business reason to access these documents after May 12, 2020, and moreover after the end of his employment with Datto on July 31, 2020.

129.   Datto took reasonable steps to keep this information secret.

130.   Certain employees, including Moore, are required to enter into comprehensive confidentiality agreements to protect Datto's trade secret, confidential information.

131.   Access to the documents Moore misappropriated is tightly controlled by Datto. Access is provided on a need-to-know basis.

132.    Each individual laptop issued to a Datto employee contains security software programs, is password-protected, and requires multiple log-ins in order to access the applications containing these documents.

133.    Similarly, all mobile devices, including iPhones, Androids, and iPads, that are used to access Datto's information are also required to be password protected.

134.    In violation of the DTSA, Moore has knowingly and improperly acquired and retained Datto's confidential and propriety information and trade secrets. Moore is improperly using Datto's trade secret information in his capacity as an employee of ConnectWise in Tampa, Florida, a direct competitor to Datto, to benefit himself and ConnectWise to Datto's detriment.

135.    Moore was not acting within the scope of his employment with Datto when he misappropriated these documents because employment with Datto ended on July 31, 2020.

136.    Moore had no legitimate business reason for accessing any of these documents because at the time he did so, he was either expected to stop performing his job duties or no longer an employee of Datto. Indeed, Moore accessed these documents for the sole purpose of misappropriating the confidential information contained therein.

137.    Moore's actions constitute actual misappropriation in violation of the DTSA.

138.    Moore's actions constitute a willful and malicious violation of the DTSA.

139.    As a result of Moore's conduct, Datto has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing value of Datto's trade secret, confidential and confidential information, harm to Datto's relationships with its customers by unfairly competing for the same customer spend, and undermining Datto's competitive edge.

140.    Datto's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

141.    Moore will continue to cause irreparable harm and damages to Datto and its trade secrets and confidential information if not restrained.

## COUNT IV
**Violation of Florida Uniform Trade Secrets Act (Fla. Stat. §§ 688.001, *et seq*.)**
**(Injunctive Relief and Damages)**

142.    Datto realleges and incorporates by reference Paragraphs 1 through 84 as though fully set forth herein.

143.    Moore surreptitiously misappropriated Datto's documents containing Datto's confidential information when he copied those documents from his Datto-issued laptops to several USB devices after he was expected to stop performing his job duties due to the upcoming redundancy of his role. Additionally, several days after the end of his employment, Moore improperly misappropriated Datto's proprietary documents containing, among other things, Datto's most sensitive and confidential information, including sales metrics and performance worldwide, compensation information for its sales representatives, strategic information regarding Datto's MSP partners, including their customer spend, and proprietary assessment of geographic markets. Moore is unlawfully using and disclosing Datto's trade secret information in his new job at ConnectWise in the Tampa, Florida area.

144.    Datto's confidential and proprietary information contained in these documents constitutes "trade secrets" of Datto within the meaning of the Florida Trade Secrets Act, Fla. Stat. Ann. §§ 688.001 *et seq*. ("FUTSA").

145.    Moore knew he had a duty to maintain the secrecy of and return Datto's trade secrets and confidential information, and Datto reminded Moore, by letter, of his obligations prior to his last day of employment. Importantly, Moore also had a duty to not access these documents after May 12, 2020, and the end of his employment with Datto on July 31, 2020.

146.    Datto took reasonable steps to keep this information secret.

147.    Certain employees, including Moore, are required to enter into comprehensive confidentiality agreements to protect Datto's trade secret, confidential information.

148.    Access to the documents Moore misappropriated is tightly controlled by Datto. Access is provided on a need-to-know basis.

149.    Each individual laptop issued to a Datto employee contains security software programs, is password-protected and requires multiple log-ins in order to access the applications containing these documents.

150.    Similarly, all mobile devices, including iPhones, Androids, and iPads, that are used to access Datto's information are also required to be password-protected.

151.    In violation of the FUTSA, Moore has knowingly and improperly acquired and retained Datto's confidential and propriety information and trade secrets. Moore is improperly using Datto's trade secret information in his capacity as an employee of ConnectWise in Tampa, Florida, a direct competitor to Datto, to benefit himself and ConnectWise to Datto's detriment.

152.    Moore was not acting within the scope of his employment with Datto when he misappropriated these documents because employment with Datto ended on July 31, 2020.

153.    Moore had no legitimate business reason for accessing any of these documents because at the time he did so, he was either expected to stop performing his job duties or no longer an employee of Datto. Indeed, Moore accessed these documents for the sole purpose of misappropriating the confidential information contained therein.

154.    Moore's actions constitute actual misappropriation in violation of the FUTSA.

155.    Moore's actions constitute a willful and malicious violation of the FUTSA.

156.     As a result of Moore's conduct, Datto has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing value of Datto's trade secret and confidential information, harm to Datto's relationships with its customers by unfairly competing for the same customer spend, and undermining Datto's competitive edge.

157.     Datto's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

158.     Moore will continue to cause irreparable harm and damages to Datto and its trade secrets and confidential information if not restrained.

**COUNT V**
**Violation of the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030, *et seq*.)**
**(Injunctive Relief and Damages)**

159.     Datto realleges and incorporates by reference Paragraphs 1 through 84 as though fully set forth herein.

160.     Through the conduct described above, Moore has violated § 1030(a)(2)(C) of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.* ("CFAA"), which states that an individual has violated the CFAA if he or she "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."

161.     Datto's proprietary documents and the confidential information contained therein, are accessible through Datto's computers, including the laptops issued to Moore, computer systems, and computer network, all of which are protected computers within the meaning of 18 U.S.C. § 1030(e)(2). Datto's computers, computer systems, and computer networks access the internet and are used in and affect interstate commerce.

162.    As described above, Moore surreptitiously accessed these documents from his Datto-issued laptops several days after his last day of employment with Datto.

163.    Moore had no legitimate business reason for accessing these documents because he was no longer an employee of Datto. As a result, Moore knowingly and intentionally accessed and copied these documents from Datto's protected computers without authorization.

164.    Through his unauthorized access, Moore has wrongfully obtained confidential information and trade secrets from Datto's protected computers, computer systems, and/or computer networks in violation of 18 U.S.C. § 1030(a)(2)(C), including but not limited to confidential information regarding Datto's current and prospective MSP partners, sales and product strategies and assessments of worldwide geographic markets.

165.    Through his actions, Moore has caused Datto to suffer loss within the meaning of 18 U.S.C. § 1030(e)(11), including but not limited to costs incurred by Datto to investigate, assess, and address Moore's misconduct. This includes, among other things, the costs associated with identifying Moore's unauthorized access to Datto's computers, computer systems, and computer networks, and the confidential information contained in the documents he has retained.

166.    As a result of Moore's conduct, Datto has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing value of Datto's trade secrets and confidential information.

167.    Datto has no adequate remedy at law and is entitled to injunctive relief or other equitable relief, as provided in 18 U.S.C. § 1030(g).

168.    Moore will continue to cause irreparable harm and damages to Datto and its trade secrets and confidential information if not enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

1.     That judgment be entered in favor of Datto and against Moore on all Counts;

2.     That Moore be ordered to comply with the terms of the Employment Agreement;

3.     That Moore be temporarily, preliminarily, and permanently enjoined and restrained from, individually or acting in concert with any other person or entity, directly or indirectly, utilizing, divulging, and/or relying on Datto's confidential information and/or trade secrets, whether in the course of his employment with ConnectWise or in any other personal or professional capacity;

4.     That Moore be temporarily and preliminarily enjoined from directly or indirectly competing with Datto for a period of two years or, at a minimum six (6) months, from the date of an order from this Court;

5.     That Defendant Moore and all those acting in concert with Moore be ordered to return to Datto the originals and all copies of all electronic and hard copy documents and emails containing Datto's confidential information  and/or trade secrets that (a) Moore obtained from Datto or created during his employment with Datto, and (b) are in Moore' possession, custody, or control, or in the possession, custody, or control of his lawyers, agents, family members, friends, employer, employees, or any other person or entities acting in concert with him or on his behalf, including but not limited to, any "personal assistant" or other such person(s) who may be assisting or working with Moore either at his current employment with ConnectWise or in any other personal or professional capacity;

6.     That Moore be ordered to provide to Datto for forensic examination, Moore's personal computer(s) and any computers or other electronic devices (e.g., tablets, smartphones,

33

external hard drives, flash or thumb drives and other such storage devices) that ever contained Datto's confidential information and/or trade secrets;

7.      That Moore be ordered to provide to Datto for forensic examination, Moore's logins and passwords to all of his online or cloud-based email accounts and document storage accounts (e.g., Gmail, Hotmail, Yahoo, Google drive, iCloud, Azure, Dropbox, Box, LinkedIn, Instagram, Facebook, Glassdoor, etc.) that ever contained Datto's confidential information and/or trade secrets;

8.      That Datto be awarded attorneys' fees, costs and disbursements incurred as a result of this action;

9.      That Datto be awarded damages in an amount to be proved at trial;

10.     That Datto be awarded punitive damages; and

11.     That Datto be awarded such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Datto demands a trial by jury of all issues so triable.

Dated: Tampa, Florida
      October 19, 2020

Respectfully submitted,


By: /s/ *Nancy J. Faggianelli*
Nancy J. Faggianelli
Florida Bar No. 347590
David R. Wright
Florida Bar No. 119453
CARLTON FIELDS, P.A.
nfaggianelli@carltonfields.com
pparrey@carltonfields.com
dwright@carltonfields.com
lfuller@carltonfields.com
tpaecf@cfdom.net
4221 Boy Scout Blvd., Suite 1000
Tampa, FL 33607-5780
Telephone: (813) 223-7000
Fax:        (813) 229-4133

Of counsel:

Clement Roberts
Michael Weil
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Fax:        (415) 773-5759
mweil@orrick.com

*Attorneys for Plaintiffs Datto, Inc. and Datto Europe Limited*